## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## McALLEN DIVISION

| | | |
|---|---|---|
| **ESTATE OF GABRIEL MIRANDA, JR.** | § | |
|     *Plaintiff,* | § | |
| **v.** | § | **C.A. No. _____** |
| **HARLINGEN CONSOLIDATED** | § | |
| **INDEPENDENT SCHOOL DISTRICT,** | § | |
| **ARTURO J. CAVAZOS,** | § | |
| **EDINBURG POLICE DEPARTMENT** | § | |
| **DAVID EDWARD WHITE,** | § | |
| **THE CITY OF EDINBURG, TEXAS,** | § | |
| **RICHARD H. GARCIA,** | § | |
| **RICHARD M. HINOJOSA,** | § | |
| **THE COUNTY OF HIDALGO,** | § | |
| **RAMON GARCIA,** | § | |
| **NORMA JEAN FARLEY, and** | § | |
| **VALLEY FORENSICS, P.L.L.C** | § | |
|     *Defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff the ESTATE OF GABRIEL MIRANDA, JR.**,** to file

this "Plaintiff's Original Complaint" and in support thereof states as follows:

### PREAMBLE

*On November 14, 2016, Gabriel Miranda, Jr., age 13, fell, or was pushed, out of the emergency door exit of a Harlingen CISD school bus going approximately 65 miles per hour over poor surface conditions, resulting in Little Gabriel's death. <u>After his death</u>, the Defendants conspired to conclude that Little Gabriel's death was a suicide (hereafter, the "Great Lie"). The Great Lie was based on discriminatory acts and omissions of the Defendants based on gender and ethnicity. This is a suit for damages to redress such discrimination.*

**PLAINTIFF'S ORIGINAL COMPLAINT**                          1

## A.   <u>NATURE OF SUIT</u>

1.     Plaintiff files this action for relief pursuant to 42 U.S.C. § 1983 with regard to the violation of the laws of the United States, seeking damages for the Defendants' violation of the Constitution of the United States.

## B.   <u>PARTIES</u>

2.     Plaintiff the **ESTATE OF GABRIEL MIRANDA, JR.** is the estate representing the decedent, Gabriel Miranda, Jr. For the purposes hereof, said Estate shall be referred to as the "Estate" or "Little Gabriel."

3.     Defendant **HARLINGEN CONSOLIDATED INDEPENDENT SCHOOL DISTRICT** ("Harlingen CISD") is a public school district located in the State of Texas and may be served with citation by serving its superintendent as follows:

**Harlingen Consolidated Independent School District**
**Arturo J. Cavazos, Superintendent**
**407 N. 77 Sunshine Strip**
**Harlingen, Texas 78550**

4.     Defendant **ARTURO J. CAVAZOS** ("Cavazos") is an individual residing in the State of Texas and may be served with citation at his place of work as follows:

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

**Arturo J. Cavazos, Superintendent**
**Harlingen Consolidated Independent School District**
**407 N. 77 Sunshine Strip**
**Harlingen, Texas 78550**

This action is brought against Defendant Cavazos in his individual capacity, as well as in his capacity as the superintendent of Defendant Harlingen CISD.

5.     Defendant **EDINBURG POLICE DEPARTMENT** ("Edinburg PD") is a public police department owned and operated by Defendant The City of Edinburg and may be severed with citation as follows:

**Edinburg Police Department**
**Edgar Ruiz, Interim Chief**
**1702 S. Closner Blvd.**
**Edinburg, Texas 78539**

6.     Defendant **DAVID EDWARD WHITE** ("White") is an individual residing in the State of Texas and may be served with citation at his place of work at:

**David Edward White**
**Edinburg Police Department**
**1702 S. Closner Blvd.**
**Edinburg, Texas 78539**

This action is brought against Defendant White in his individual capacity, as well as in his capacity as the former Chief of Police of Defendant Edinburg PD.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                      3
tpg 2018.11.12

7.      Defendant **THE CITY OF EDINBURG, TEXAS** ("Edinburg") is a political subdivision created within the State of Texas and may be served with citation as follows:

> **The City of Edinburg, Texas**
> **Richard Molina, Mayor**
> **415 W. University Drive**
> **1702 S. Closner Blvd.**
> **Edinburg, Texas 78541**

8.      Defendant **RICHARD H. GARCIA** ("RH Garcia") is an individual residing in the State of Texas and may be served with citation at his place of work at:

> **Richard H. Garcia**
> **The City of Edinburg, Texas**
> **415 W. University Drive**
> **Edinburg, Texas 78541**

This action is brought against Defendant RH Garcia in his individual capacity, as well as in his former capacity as the former mayor of Defendant Edinburg.

9.      Defendant **RICHARD M. HINOJOSA** ("Hinojosa") is an individual residing in the State of Texas and may be served with citation at his place of work at:

> **Richard M. Hinojosa**
> **The City of Edinburg, Texas**
> **415 W. University Drive**
> **Edinburg, Texas 78541**

4

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

This action is brought against Defendant Hinojosa in his individual capacity, as well as in his capacity as the former City Manager of Defendant Edinburg.

10.    Defendant **THE COUNTY OF HIDALGO, TEXAS** ("Hidalgo") is a political subdivision created within the State of Texas and may be served with citation as follows:

**The County of Hidalgo, Texas**
**Ramon Garcia, County Judge**
**100 N. Closner Blvd.**
**Edinburg, Texas 78539**

11.    Defendant **RAMON GARCIA** ("Judge Garcia") is an individual residing in the State of Texas and may be served with citation at his place of work at:

**Ramon Garcia, County Judge**
**The County of Hidalgo, Texas**
**100 N. Closner Blvd.**
**Edinburg, Texas 78539**

This action is brought against Defendant Judge Garcia in his individual capacity, as well as in his capacity as the County Judge of Defendant Hidalgo.

12.    Defendant **NORMA JEAN FARLEY** ("Farley") is an individual residing in the State of Texas and may be served with citation at her place of work at:

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                         5

**Norma Jean Farley**
**VALLEY FORENSICS, P.L.L.C,**
**3100-A S. Business Highway 281**
**Edinburg, Texas 78539**

This action is brought against Defendant Farley in her individual capacity.

13.     Defendant **VALLEY FORENSICS, P.L.L.C.** is a Texas professional

limited liability company ("VF"), does business in the State of Texas, and may be

served with citation by serving Defendant VF's member as follows:

**VALLEY FORENSICS, P.L.L.C,**
**c/o Norma Jean Farley, member**
**3100-A S. Business Highway 281**
**Edinburg, Texas 78539**

## C.  JURISDICTION and VENUE

14.     The jurisdiction of this Court is in accordance with 28 U. S. C. § 1331

as involving a *federal question* proceeding arising under Section 1983 of Title 42 of

U.S.C. ("Section 1983").

15.     Venue is proper in the Southern District of Texas (McAllen Division)

because all the actions of the Defendants took place in Hidalgo County, Texas,

which is within the McAllen Division of the Southern District of Texas in the

United States Federal District Courts.

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

### D.    FACTUAL ALLEGATIONS

#### *Welcoming Little Gabriel*

16.    Although the temperature in Richmond, Texas reached a chilly 36 degrees on the day Plaintiff Little Gabriel was born (December 28, 2002), Little Gabriel greeted his new world with a smile that would warm the heart of everyone.

17.    Plaintiff Little Gabriel weighed 6 pounds, 5 ounces at birth and was perfect in every possible way.

18.    Little Gabriel's birth gave tremendous joy not only to his mother ("Maria") and father ("Gabriel, Sr.") but also to his grandparents, uncles, aunts, numerous cousins, brother, and sister.

19.    Little Gabriel's life at home was a world of excitement and joy, filled with countless hugs to and from his family.

#### *School Days*

20.    From pre-kindergarten through fifth grade, Plaintiff Little Gabriel attended Travis Elementary School within Defendant Harlingen CISD. Science and Music were his favorite classes, with David Garza being his favorite teacher at Travis Elementary School. Perhaps Mr. Garza was one of the reasons why music would become such an important part of Little Gabriel's life.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    7

21.   For sixth grade in 2013, Plaintiff Little Gabriel moved up to Vernon Middle School within Defendant Harlingen CISD, which would be the last school Little Gabriel would ever attend in his young life.

22.   At Vernon Middle School, Plaintiff Little Gabriel studied hard. As of the second week in November 2016, Little Gabriel had a grade of 100 in each of the following four of his classes:

> Science;
> American history;
> School band; and
> Physical education.

23.   Plaintiff Little Gabriel's love for music also continued to blossom. Little Gabriel joined the Vernon Middle School Band and learned how to play the baritone saxophone and saxophone.

24.   One of Little Gabriel's favorite songs was the 1946 contemporary pop hit *Beyond the Sea* as arranged for the 2003 animated Disney movie *Finding Nemo.*

25.   Plaintiff Little Gabriel had music everywhere in his life. Little Gabriel would *Google* songs he liked, download the respective sheet music, and then sound out the notes on his saxophone.

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

26.     Whether pop hits from today to country, Tex-Mex, jazz classics, Beethoven, Bach, or hits from the 50s through 70s, Plaintiff Little Gabriel loved them all.

27.     During the week of November 7, 2016, Plaintiff Little Gabriel's hours of practice on the baritone saxophone paid off as he was awarded "first chair" in the Vernon Middle School band. Attached hereto as Exhibit "1" and incorporated herein by reference is Little Gabriel smiling proudly in his band uniform.

28.     So overjoyed with his band participation, Plaintiff Little Gabriel even designed a t-shirt ("Band T-Shirt") for the Vernon Middle School Band— "*Free Hugs For Everyone*" surrounding a cute alien animal.

### The Day the Music Died

29.     November 14, 2016 was a Monday. Plaintiff Little Gabriel awoke early, excited about his upcoming field trip. Little Gabriel and his classmates from Vernon Middle School would be going to visit The University of Texas Rio Grande Valley Campus ("Field Trip").

30.     Being just a few miles away, Little Gabriel and his class would board Defendant Harlingen CISD school buses for the quick trip to Edinburg.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                      9

31.     Although Plaintiff Little Gabriel was only in the 8th grade, thoughts of college were not far away. Little Gabriel had already taken early education engineering courses at Texas State Technical College as a mean to obtain additional certificates or degrees upon his high school graduation.

32.     On the morning of November 14, 2016, Plaintiff Little Gabriel specifically reminded his mother (Maria) to be sure and order the Band T-Shirts that Little Gabriel had designed.

33.     Maria had no idea that her discussion with Plaintiff Little Gabriel that morning about the Band T-Shirt would be the last words she ever spoke with her precious son.

34.     Plaintiff Little Gabriel and 40 others from his class at Vernon Middle School boarded school bus #118 ("Bus #118") which is owned and operated by Defendant Harlingen CISD.

35.     Before boarding Bus #118 for the Field Trip, Plaintiff Little Gabriel was informed that he had been selected to play a "solo" piece at an upcoming band performance.

36.     On that fateful day, Bus #118 was being driven by Laura Castro Ruiz ("Ruiz"), an employee of Defendant Harlingen CISD.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    10
tpg 2018.10.24

37.     Protocols of Defendant Harlingen CISD require that each school bus have two adults on board for field trips, not counting the bus driver.

38.     To ensure the safety of Plaintiff Little Gabriel and his classmates during the Field Trip, Defendant Harlingen CISD assigned two of the teachers from Vernon Middle School to ride on Bus #118 along with the students.

39.      Selected to monitor and ensure the safety of Plaintiff Little Gabriel and his classmates while traveling on Bus #118 were A. J. Ayala ("Ayala") and Michael J. Carlsted ("Carlsted").

40.     Ayala was Little Gabriel's eighth grade American history teacher. Carlsted was Little Gabriel's Science teacher. Little Gabriel liked both teachers a great deal.

41.     Protocols of Defendant Harlingen CISD require that one of the monitoring adults sit in the back of the school bus and one sit in the front, a protocol based on common sense and reasonable care. However, Ayala and Carlsted chose to sit together at the front of Bus #118.

42.     The choice made by Ayala and Carlsted was literally a fatal decision made as to Plaintiff Little Gabriel's life.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    11

43.    Plaintiff Little Gabriel and some of his friends elected to sit at the rear of the Bus #118 for the Field Trip.

44.    By all accounts, the students on Bus #118 were boisterous and happy as they left on the Field Trip.

45.    However, at approximately 9:45:02 a.m. Monday, November 14, 2016, Plaintiff Little Gabriel fell, or was pushed, out of the emergency exit door of Bus #118 ("EEx. Door").

46.    With Bus #118 traveling at approximately 65 miles per hour over poor road conditions, there was little chance Plaintiff Little Gabriel would survive such a fall (hereafter, "Little Gabriel's Fall").

47.    Although Bus #118 continued traveling for several miles before pulling over to the side of the road, the oncoming cars following Bus #118 swerved or stopped to avoid running over Plaintiff Little Gabriel.

48.    A second school bus (identified as Defendant Harlingen CISD school bus #38 ("Bus #38"), which was also carrying members of Little Gabriel's class, was next to arrive and did pull over to the right of the roadway.

49.    Sheriff's Deputy James Prado of the Hidalgo County Sheriff's department was one of the first law enforcement personnel to arrive on the scene.

**PLAINTIFF'S ORIGINAL COMPLAINT**

The description of what occurred next is taken verbatim from Deputy Prado's

incident report:

> "On Monday, November 14, 2016, Hidalgo Co. Sheriff's Deputy James Prado #2216 responded to north of Canton Road on U.S. 281, regarding a child who fell out of a school bus on the highway.
>
> - Deputy Prado moved north from Canton Road on the northbound 281 frontage road, onto the on ramp.
>
> - Deputy Prado moved forward towards the end of the on ramp and observed a small blue colored passenger car; stationary facing north.
>
> - Deputy Prado saw a young man on his knees, without a shirt and appeared to be holding another individual in his arms.
>
> - Deputy Prado provided dispatch with the location and had also observed a school bus (#38) parked on the shoulder of the roadway, several yards away.
>
> - Deputy Prado ran towards to the two people and found a young boy lying upward on the man's lap.
>
> - A large amount of blood was exiting from the back of the boy's head, while man appeared to have removed his t-shirt to wrap it behind the boy's head.
>
> - The man told Deputy Prado that the boy wasn't breathing and had no pulse.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    13

- Deputy Prado found blood around the boy's mouth and on the man helping the boy.

- Deputy Prado put on his latex rubber gloves, to start checking the boy's vital signs.

- Deputy Prado noticed the boy's chest wasn't rising and wouldn't respond to the man as he kept talking to the boy.

- A female individual approached Deputy Prado and said there were three buses that were parked further up from the scene.

- The female said she heard a young girl inside bus #38 scream and had said the boy fell out of the bus.

- Deputy Prado ran to his patrol unit, to get his medical gear bag.

- Deputy Prado ran back to try and provide treatment for the boy.

- Deputy Prado told the man to help him lay the boy down flat on the ground, so CPR could be provided, in which his body was adjusted so he could lie down.

- Deputy Prado saw a female Edinburg Police Officer arrive to assist and she told to start applying chest compressions on the boy.

- Deputy Prado checked his medical bag and wasn't able to find an item to help the boy breath.

- Shortly afterwards, several Edinburg Police Officers arrived on the scene.

- Several Edinburg Firefighters had also arrived to provide treatment for the boy.

**PLAINTIFF'S ORIGINAL COMPLAINT**

tpg 2018.10.24

- Deputy Prado identified the female as [*witness one*] who said she was on one of the school buses (#38) and was chaperoning the students in the bus.

- [*Witness one*] said she was with the Harlingen School District, but wasn't sure exactly how the boy fell out of the bus.

- [*Witness one*] added that the boy's name was Gabriel, but didn't know his grade or age.

- Deputy Prado contacted the male individual, helping the boy as [witness two].

- [Witness two] said he was driving northbound on Highway 281, when he saw the young boy lying on the ground and stopped to help him.

- [Witness two] said he saw the boy was bleeding a lot from the back of his head.

- [Witness two] told Deputy Prado that he took off his shirt and wrapped it up, so he could try and stop the bleeding on the boy's head.

- [Witness two] said he didn't know who the boy was, but that he had to do something."

50.    Sheriff's Deputy Jose Lopez of the Hidalgo County Sheriff's

department arrived at the scene to assist Deputy Prado. Deputy Lopez noted:

"On November 14, 2016 at about 0947 hours I Hidalgo County Sheriff's Office Deputy Jose Lopez #4040 was dispatched

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    15

North of Freddy Gonzalez Road on Expressway 281, Edinburg, Texas in reference to Assist Agency Report. Dispatch advised that a child possibly fell off a school bus.

- Arrived at location and observed a school bus stationary north of Sprague Road on Expressway 281.

- Observed Edinburg Fire Department at location.

- Proceeded to assist with traffic control by placing my unit several hundred feet south from the scene.

- Observed other Emergency units and Edinburg Police units arrive at location.

- Resumed patrol.

- No further action taken."

51.     Bus #38 (filled with classmates of Plaintiff Little Gabriel) remained at the scene for some time, thereby exposing the Vernon Middle School students on board to witness the tragic events unfolding.

### *Directed to the Wrong Hospital*

52.     Emergency personnel raced Plaintiff Little Gabriel to Doctors Hospital at Renaissance in Edinburg.

53.     However, Graciela Gutierrez (the principal of Vernon Middle School) called Maria and informed her that Plaintiff Little Gabriel was being taken to Memorial Arms Hospital in McAllen.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                    16

tpg 2018.10.24

54.     Plaintiff Gabriel Sr. was at the house with Maria that morning, and they both raced out of their home. With no real idea of what was happening to their son (Plaintiff Little Gabriel), Maria and Gabriel Sr. headed towards Memorial Arms Hospital in McAllen.

55.     At approximately 10:25 a.m., Maria received another call from Principal Gutierrez. Principal Gutierrez then informed Maria and Gabriel Sr. that Plaintiff Little Gabriel was actually being taken to Doctors Hospital at Renaissance in Edinburg, not Memorial Arms Hospital in McAllen.

56.     By the time Maria and Gabriel Sr. finally arrived at Doctors Hospital at Renaissance in Edinburg, Plaintiff Little Gabriel had been pronounced dead (hereafter, "Little Gabriel's Death").

57.     Hundreds of family members and friends would gather to give their final farewells to Plaintiff Little Gabriel.

58.     To ensure that Plaintiff Little Gabriel's plans for his Band T-Shirt came true, Maria and Gabriel Sr. ordered t-shirts made with Little Gabriel's shirt design.  Maria and Gabriel Sr. then donated the Band T-Shirts to the Vernon Middle School Band.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                 17

### *The Non-Investigation*

59.     As horrific and tragic as that moment of Plaintiff Little Gabriel's Death was for Maria and Gabriel, little did they know that the Defendants would intentionally take acts and make ommissions which would further harm their now deceased son, Plaintiff Little Gabriel.

60.     The investigation conducted by Defendants into Little Gabriel's Death ("the Non-Investigation") was to last no more than 48 hours.

61.     The Non-Investigation appears to have been limited to the following:

>   (a)     some photographs of the scene and the inside of Bus #118 were taken;

>   (b)     the video taken from inside of Bus #118 ("Bus #118 Video") was purportedly reviewed;

>   (c)     after a business (located near the scene) reported that its outside security camera might have recorded ("CCTV Clip") Plaintiff Little Gabriel's Fall, Defendant Edinburg PD made a hand copy of such CCTV Clip [*for reasons unknown, Edinburg PD did not take custody of the original digital recording of the CCTV Clip*];

>   (d)     a toxicology report ("Toxicology Report") was ordered; and

>   (e)     Defendant Hidalgo County instructed its subcontracted pathologist, Defendants Farley and VF, to conduct an autopsy ("Autopsy").

For the purposes hereof, subparagraph (a) to (e) shall be collectively referred as to the "The Purposely Limited Evidence."

62.    On the day of Plaintiff Little Gabriel's Death, Defendant Cavazos informed the public that Defendant Harlingen CISD had just recently received funding for new video cameras to be installed in its school buses. As a result, Cavazos announced that the Bus #118 Video would provide the answers within just a matter of hours.

63.    Although never subsequently announced by any of the Defendants, the video system on Bus #118 Video had failed. Reminiscent of the infamous "18 minute gap" of the Watergate Tapes which resulted in the resignation of President Richard M. Nixon, the video system on Bus #118 shows a blank screen until ***after*** Plaintiff Little Gabriel's Fall.

64.    Although audio from Bus #118 was available, there is no indication that the Non-Investigation included more than just a cursory examination.

### *The Great Lie*

65.   On just the second day after Plaintiff Little Gabriel's Death, in the morning of Wednesday, November 16, 2017, Defendants announced the purported cause of Little Gabriel's Death.

66.   None of the Defendants had the decency of personally informing any of the family of Plaintiff Little Gabriel that a cause of death had been decided upon. Rather, in front of Plaintiff Little Gabriel's home and standing before family members, friends, and neighbors, Lt. Oscar Trevino (then, an Assistant Police Chief of Edinburg PD) yelled: "*It is being ruled a suicide" [meaning Little Gabriel's Death]* (hereafter, the "*Great Lie*"). Unbelievably, the Non-Investigation concluded that Little Gabriel had purposely "jumped" from Bus #118 with the sole intent of taking his own life.

67.   The adoption of the Great Lie by Defendants was based solely on (a) a rumor from a student on Bus #118, who stated that Plaintiff Little Gabriel was upset because his puppy love girlfriend had purportedly broken up with him, (b) on three seconds of a 25 second video clip, that, actually shows no evidence to support the Great Lie, and, (c) most importantly, the apparently shared view of Defendants *that*

*it is common for young men (meaning Hispanic) from the Valley to commit*

*suicide, even without ever showing prior signs of depression.*

68.    Defendants acted in concert as to the Non-Investigation and the

adoption the Great Lie:

    (a)    even though the evidence indicates that Plaintiff Little Gabriel fell or was pushed from the EEx. Door;

    (b)    even though the location of the fatal blow to Plaintiff Little Gabriel's head does not support the conclusion of the Great Lie;

    (c)    without any evidence indicating that Plaintiff Little Gabriel was depressed, despondent or upset;

    (d)    without interviewing Maria, Gabriel Sr.;

    (e)    without interviewing anyone in Plaintiff Little Gabriel's family;

    (f)    even though there is no Bus #118 video footage showing Plaintiff Little Gabriel's Fall;

    (g)    even though no transcript of the audio from Bus #118 was ever made;

    (h)    without an examination of the internal workings of the EEx. Door;

> (i) without any review into whether there were any emotional issues ongoing as to Plaintiff Little Gabriel; and
>
> (j) without any drug or toxicology test having been ordered of the Bus #118 driver, being Ruiz.

For the purposes hereof, subparagraph (a) to (j) shall be collectively referred as to the "Evidence Ignored."

69. Although the Autopsy performed for Defendant Hidalgo County by Defendants Farley and VF, and subsequently adopted by the other Defendants, concluded that the "manner" of Little Gabriel's Death was suicide ("Autopsy Conclusion"), the Autopsy Conclusion is nothing but an intentionally derived sham, coordinated by the Defendants.

70. No further official review into Plaintiff Little Gabriel's Death would be undertaken by any of the Defendants.

71. The Plaintiff Estate is being irreparably harmed by Defendants' continued reliance upon, and the public and private pronouncements and assertions by the Defendants, that:

> (a) Plaintiff Little Gabriel was depressed, despondent, upset, or suicidal on November 14, 2016;
>
> (b) Plaintiff Little Gabriel jumped from EEx. Door of Bus #118;

**PLAINTIFF'S ORIGINAL COMPLAINT**

tpg 2018.10.24

(c)     Plaintiff Little Gabriel jumped from the EEx. Door of
Bus #118 for the purpose of taking his own life; and

(d)     the Autopsy Conclusion was that Plaintiff Little Gabriel
had committed suicide.

For the purposes hereof, the foregoing assertions shall be collectively referred to as

the "Continued Falsehoods."

72.     Defendants' continued reliance upon, and the continual public and

private pronouncements and assertions of, the Continued Falsehoods has caused,

and is expected to continue to cause, serious, permanent, and irreparable harm to

the Plaintiff Estate.

73.     None of Defendants has the legal or moral right to continue to cause

such harm.

### *The Family Investigation*

74.     Under any scenario, the pain suffered by the family of Plaintiff Little

Gabriel is unimaginable and beyond description. However, Defendants' continued

and intentionally infliction of additional harm to the Plaintiff Estate by relying on

the Great Lie (*after only a forty-eight hour investigation and without regard for the

Evidence Ignored*) is malicious and reprehensible.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                     23

75.     However, Defendants adoption the Great Lie did not mean that the family of Plaintiff Little Gabriel was going to accept the Great Lie. Just because the Defendants did not care about Little Gabriel's Death does not mean the family of Little Gabriel was finished looking for answers.

76.     Beginning the day of Plaintiff Little Gabriel's Death and continuing through the filing of this lawsuit, the family of Plaintiff Little Gabriel has not ceased asking questions ("Family Investigation").

77.     In part, the Family Investigation has found the following:

(a)     Defendant Harlingen CISD had a duty to maintain Bus #118 to ensure that the operation and use of Bus #118 would not create or allow for harm to come to any of the students while riding Bus #118;

(b)     the driver of Bus #118 (being Ruiz) was, at all times relevant to Plaintiff Little Gabriel's Fall, an employee of Defendant Harlingen CISD;

(c)     at all times relevant to Plaintiff Little Gabriel's Fall, Ruiz was acting within her scope of employment with Defendant Harlingen CISD;

(d)     Defendant Harlingen CISD had a duty to ensure that Ruiz was properly trained in all aspects of the operation and use of Bus #118;

(e)     Defendant Harlingen CISD had a duty to ensure that Ruiz was not in an impaired condition while

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

operating Bus #118 on the day of Plaintiff Little Gabriel's Fall;

(f)    within Ruiz's scope of duties as the driver of Bus #118, Ruiz had an obligation to inspect and ensure that all aspects of Bus #118 would operate and could be used in a safe manner while being driven on the day of Plaintiff Little Gabriel's Fall;

(g)    within Ruiz's scope of duties as the driver of Bus #118, Ruiz had an obligation to inspect and ensure the interior and exterior of the EEx. Door on Bus #118 would operate and could be used properly on the day of Plaintiff Little Gabriel's Fall;

(h)    within Ruiz's scope of duties as the driver of Bus #118, Ruiz had an obligation to inspect and ensure that all cameras and alarms on Bus #118 were working properly on the day of Plaintiff Little Gabriel's Fall;

(i)    that Ruiz's was operating Bus #118 at an excessively high rate of speed at the time of Plaintiff Little Gabriel's Fall;

(j)    immediately prior to Plaintiff Little Gabriel's Fall, Bus #118 was seen to be bouncing up and down as though Bus #118 had run over something or was traveling over uneven pavement, with such bouncing being attributable to the excessive rate of speed and the road conditions;

(k)    pictures of the inside of the EEx. Door of Bus #118 show marks that could be consistent with damage to the interior side of the EEx. Door, which could

indicate that certain damage occurred to the EEx. Door the day of Plaintiff Little Gabriel's Fall or prior thereto, which could be attributed to the described bouncing of Bus #118;

(l)   witnesses saw Plaintiff Little Gabriel falling, not jumping, from the EEx. Door of Bus #118;

(m)   a classmate of Plaintiff Little Gabriel was overheard saying: that he (Little Gabriel) didn't intentionally jump out;

(n)   classmates of Plaintiff Little Gabriel continue to indicate that what really happened to Little Gabriel has yet to be disclosed;

(o)   Ayala and Carlsted were both seated at the front of Bus #118;

(p)   on the audio tape from Bus #118, buzzing sounds can be heard prior to the time the EEx. Door of Bus #118 fully opened,

(q)   Defendant Harlingen CISD subsequently declared Ayala to be one of the district's Teacher of the Year;

(r)   for reasons unknown, Bus #118 was subsequently being parked at the recycle center of Defendant Harlingen CISD; and

(s)   in support of her Autopsy Conclusion, Defendants Farley and VF replied: (*paraphrasing*) *that it is common for young men [meaning Hispanic] from the Valley to commit suicide, even without ever showing prior signs of depression.*

**PLAINTIFF'S ORIGINAL COMPLAINT**

tpg 2018.10.24

For the purposes hereof, subparagraph (a) to (s) shall be collectively referred as to the "Family Findings."

### *The Coverup*

78.     As of the filing of this lawsuit, it remains unclear as to how and why Plaintiff Little Gabriel's Fall occurred.

79.     What are Defendants hiding with Defendants' Non-Investigation and Defendants' adoption of the Great Lie?

80.     Even with the Family Findings obtained through the Family Investigation, the following questions remain:

> (a)     Why did the EEx. Door open?
>
> (b)     Did the EEx. Door malfunction and open on its own?
>
> (c)     Was Plaintiff Little Gabriel pushed through the EEx. Door?
>
> (d)     Why did Defendant Edinburg PD refuse to impound Bus #118 as part of The Non-Investigation?
>
> (e)     Why did Defendant Harlingen CISD refuse to impound Bus #118 as part of the Non-Investigation?
>
> (f)     Why did Defendant Harlingen CISD continue to use Bus #118 after Little Gabriel's Fall?

**PLAINTIFF'S ORIGINAL COMPLAINT**                                         27

(g)    Did Ruiz perform a safety check of the EEx. Door before the Field Trip?

(h)    Had the EEx. Door ever malfunctioned previously?

(i)    Did Harlingen CISD actually install new video cameras on Bus #118 before the Field Trip?

(j)    Why is there no video of the moments leading up to, and including, Plaintiff Little Gabriel's Fall?

(k)    Was the Bus #118 Video tampered with?

(l)    Why did Cavazos never publicly announce that the Bus #118 Video had failed?

(m)    Why did Ayala not sit at the back of Bus #118?

(n)    Why did Carlsted not sit at the back of Bus #118?

(o)    Why did Ruiz not slow down when the EEx. Door buzzer sounded, indicating it was opening?

(p)    Were there monitors at the front of Bus #118 that would have indicated the EEx. Door was opening? If not, why not?

(q)    Did Defendant Harlingen CISD actually install new cameras on Bus #118?

(r)    Did the Non-Investigation ever obtain a digital copy of the CCTV Clip?

**PLAINTIFF'S ORIGINAL COMPLAINT**                                      28

(s)     Was the Non-Investigation and the Great Lie merely a "coverup" to avoid a meaningful investigation?

(t)     Even though a 2007 Texas law mandated seat belts for school buses, why were there no seat belts on Bus #118?

(u)     Why were the students on Bus #118 allowed to stand up on Bus #118?

(v)     Why do students from Bus #118 keep posting on social media that "the true story of Plaintiff Little Gabriel's Death has not yet been told?"

(w)     Why do other students keep posting on social media that "the true story of Plaintiff Little Gabriel's Death has not yet been told?"

(x)     Where is the safety review that Defendant Cavazos promised?

(y)     Why was Little Gabriel Hispanic ethnicity, male gender, and living in the Valley cited as support for the Great Lie?

(z)     Why did Defendant Harlingen CISD declare Ayala to be one of the district's Teacher of the Year?

(aa)    Why was the Autopsy rushed?

(bb)    Why did the Non-Investigation end after just 48 hours?

(cc)   Was the operation of Bus #118 during the Field Trip within the policies and procedures of Defendant Harlingen CISD?

(dd)   How often during the Non-Investigation did the Defendants confer prior to the announcement of the Great Lie?

(ee)   How often did the Defendants confer prior to the announcement of the Great Lie?

(ff)   Were any of the 911 callers ever contacted?

(gg)   Why did the EEx. Door open while Ruiz was operating Bus # 188 at an excessive rate of speed over bumpy road conditions?

For the purposes hereof, subparagraphs (a) to (gg) and others shall be collectively referred as to the "Unanswered Questions."

81.   Pending in the Hidalgo District Court are claims related to the causes of Little Gabriel's Death and such matters are not included in the cause of action asserted herein.

### *Intentional acts to Harm*

82.   Without limiting the applicable acts constituting bad faith, willfulness, malice, or reckless disregard, the Plaintiff Estate hereby asserts the following acts and omissions taken in concert by Defendants, which have caused harm to be

**PLAINTIFF'S ORIGINAL COMPLAINT**

suffered by the Plaintiff Estate:

> (a)   the Non-Investigation;
>
> (b)   the Great Lie;
>
> (c)   the Purposely Limited Evidence;
>
> (d)   the Evidence Ignored;
>
> (e)   the Continued Falsehoods; and
>
> (f)   the Autopsy Conclusion; and
>
> (g)   the Coverup of the true cause of Plaintiff Little Gabriel's Death.

Hereafter the actions in the preceding Paragraphs 16 and 82 which occurred after the death of Plaintiff Little Gabriel Death shall be collectively referred to herein as the "Post-Death Acts to Harm."

### *Defendants' Action Under the Color of State Law*

83.   Each of the Defendants, and their respective agents were implementing the policies, practices, and procedures of each respective Defendant when committing the Post-Death Acts to Harm Plaintiff Little Gabriel.

84.   If such policies, practices, and procedures are not, in fact written, each of the Defendants, and their respective agents were implementing the policies,

**PLAINTIFF'S ORIGINAL COMPLAINT**                                             31

practices, and procedures in accord with the customs and practices of the policy makers of each Defendant when committing the Post-Death Acts to Harm Plaintiff Little Gabriel.

85.   Further, Defendants have publically adopted and affirmed the Post-Death Acts to Harm Plaintiff Little Gabriel.

### *Harm to Plaintiff Estate*

86.   Defendants' Post-death Acts to Harm have caused serious injury and damage to the Plaintiff Estate and is expected to continue to cause, serious injury and damage to the Plaintiff Estate.

87.   In order to seek redress for the harm resulting from Defendants' Post-death Acts to Harm, the Plaintiff Estate was required to engage legal counsel to pursue this request for relief.

88.   All conditions precedent to Plaintiff the Estate to bring these claims have been satisfied.

### E.   PLAINTIFF'S CAUSES OF ACTION

89.   The Plaintiff Estate incorporates by reference the facts set forth in the foregoing ARTICLE D: GENERAL BACKGROUND hereof.

**PLAINTIFF'S ORIGINAL COMPLAINT**
tpg 2018.10.24

## COUNT ONE: SECTION 1983

90.     Section 1983 of Title 42 of the United States Code provides, in part:

> "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, and citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the part injured in an action at law, suit in equity, or other proper proceeding for redress…"

91.     Under Texas law, the Plaintiff Estate is considered to be a "person" subject to harm with the right to recover damages.

92.     Defendants' Post-death Acts to Harm were committed under the color of law and resulted in the violation of The Plaintiff Estate's' procedural and substantive due process rights, and equal protection rights, afforded the Plaintiff Estate under the United States Constitution. As a result, Defendants' Post-death Acts to Harm are violations that the Plaintiff Estate is allowed to seek redress under Section 1983 ("Section 1983 Violations").

93.     The Plaintiff Estate has suffered harm and damages as a result of the Section 1983 Violations set forth herein and committed by Defendants entitling the

Plaintiff Estate to compensatory damages (actual and consequential) pursuant to Section 1983, for which the Plaintiff Estate now sues.

## COUNT TWO: EXEMPLARY DAMAGES

94.    Defendants' Section 1983 Violations toward the Plaintiff Estate were pursued with malice or reckless indifference to the Plaintiff Estate's protected rights, thereby entitling the Plaintiff Estate to punitive damages pursuant to Section 1983, for which The Plaintiff Estate now sues.

## COUNT THREE: POST JUDGMENT INTEREST

95.    The Plaintiff Estate also requests post judgment interest as may be allowed by applicable law.

## COUNT FOUR: ATTORNEYS' FEES

96.    The Plaintiff Estate should be awarded its reasonable and necessary attorneys' fees incurred in relation to the foregoing as allowed by applicable law.

## F.    REQUEST FOR JURY TRIAL

97.    The Plaintiff Estate hereby requests that a jury be empaneled, and, that the foregoing causes of actions and requests for relief be presented to such jury for resolution.

### G.  **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff ESTATE OF GABRIEL MIRANDA, JR, prays the necessary summons be issued, that upon final trial hereof, that upon final trial hereof, that judgment be entered in favor of Plaintiff for the actual, consequential, and exemplary damages set forth herein including post judgment interest; that Plaintiff be reimbursed its reasonable and necessary attorneys' fees required to bring this matter; that all costs of Court be taxed against Defendants; and that Plaintiff have such further and other relief, general and special, both at law or in equity, to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,

GORMAN LAW FIRM, pllc

By: _____
Terry P Gorman, Esq.
Texas Bar No. 08218200
tgorman@school-law.co
901 Mopac Expressway South, Suite 300
Austin, Texas 78746
Telephone: (512) 320-9177
Telecopier: (512) 597-1455
**COUNSEL FOR PLAINTIFF**
**ESTATE OF GABRIEL MIRANDA, JR.**

**EXHIBIT "A"**
**to**
**PLAINTIFF's ORIGINAL COMPLAINT**

