**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF GABRIEL MIRANDA, JR.,** | § | |
| **Plaintiffs,** | § | **Civil Action No. 7:18:cv-0348** |
| | § | |
| **v.** | § | |
| | § | |
| **HARLINGEN CONSOLIDATED** | § | |
| **SCHOOL DISTRICT, et al** | § | |
| **Defendant.** | § | **JURY DEMAND** |

<u>**SECOND AMENDED COMPLAINT**</u>
**AND REQUEST FOR DECLARATORY RELEIF**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Gabriel Miranda, Jr., Deceased by and through his heirs at law[1] including his natural parents and siblings named above, collectively called Plaintiffs herein, complaining of the Harlingen Consolidated School District ("the School District Defendant"), their (then) Superintendent Arturo J. Cavazos ("Cavazos"), in his Official Capacity; the City of Edinburg, their (then) Police Chief in his Official Capacity and Norma Jean Farley, Individually and Valley Forensics, P.L.L.C, files this their *Second Amended Complaint and Request For Declaratory Relief* and would respectfully show this Court as follows:

## I. <u>BRIEF INTRODUCTION TO THIS CASE</u>

1.      On or about November 14, 2016 Gabriel Miranda, Jr. was on a field trip with other members of the Vernon Middle School 8th Grade Band. At some point the exit door opened slightly and a loud buzzer went off, signaling to all aboard the bus, including and especially the bus

---

[1].  Plaintiffs ask the Court to take Judicial Notice of the state probate court proceedings of Cause No. 2018-CPC-003267, where mother and father were appointed as co-representatives of the estate.

driver, the door was ajar.  Instead of slowing down and stopping the bus as required, the driver continued driving, now at an unsafe speed. The buzzer went off again and again, and each time the bus driver failed to stop continuing to drive in a dangerous manner.  Finally, the door opened all the way and Gabriel tried to close the door but could not.  He fell out of the speeding vehicle and was severely injured and later died.   In fact, the School Bus Driver, Ms. Laura Ruiz, was interviewed a number of times after the incident, and each time admitted she heard the buzzer that the back exit door was ajar but failed to stop, as she admitted she was required to do.   As to the failures of the bus driver to operate the vehicle safely, Plaintiffs have brought forth this claim pursuant to the Texas Tort Claims Act, and seek damages accordingly.  This claim is currently set at 7:21‑cv‑00337 before this Court.

2.   After Gabriel's fall from the bus and before a thorough and  full investigation and autopsy had not yet taken place, the Defendant School District joined with representatives of the Edinburgh Police Department and conspired a theory that Gabriel died because he had committed suicide.  The County Coroner Defendant Farley confirmed and printed this "false narrative."   Additionally Farley gave an unsolicited opinion that many young men (like Gabriel) of Hispanic descent and had lived in the Valley commit suicide even with no prior warnings, and even though a full and proper investigation was not yet complete.

3.   The School Bus reportedly had video confirmation of what happened but inexplicably, but maybe not surprisingly, the relevant video segments were gone.  But the audio portions were not and they very clearly evidence that Gabriel did not commit suicide but was rather attempting to close to the exit door of the bus, was not able to do and sadly fell to his death.  Based upon Defendant Farleys's statement the Plaintiffs also bring forth a claim against the

School District and City Defendants pursuant to Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §2000d.  In addition they will re-urge the constitutional claims argued in the earlier litigation but with a factual predicate where none existed previously.

4.  Moreover they  seek *Declaratory Relief* pursuant to Fed. R. Civ. P. 57; 28 U.S.C. §2201, a *Temporary Restraining Order* and later a *Permanent Injunction*, pursuant to Fed. R. Civ. P. 65 asking the Court to compel Farley to reform her *Coroner's Report* to reflect that Gabriel died from trauma to his head (or some other reasonable related alternative) and not suicide.

## II. <u>JURISDICTION</u>

5.  Jurisdiction is conferred upon this Court because the Defendant removed their cause to federal court This Court also has jurisdiction to hear claims for alleged violations of the Constitution and laws of the United States.

6.  Last the Court has concurrent jurisdiction over state law claims pursuant to to 28 U.S.C. §1367.

## III. <u>VENUE</u>

7.  This Venue is proper before this Court because the acts and omissions of the Defendant, giving rise to this cause, occurred in the County of Harlingen, in the Southern District of Texas, McAllen Division.

## V. <u>PARTIES AND SERVICE</u>

8.  The following persons bring forward this claims, as the Heirs of Gabriel Miranda, Jr.; his natural mother Maria Fuentes and father, Gabriel Miranda, Sr.; his siblings Alexanda Suzanne Deleon, Reuben Antonio Deleon, III and a minor sibling simply identified as Joe Hidalgo Doe.  At all time relevant to this cause each person lived in Texas and were under

the jurisdiction of this court.

9.      The Defendant School District has been served and has answered by and through their attorneys of record, the Honorable Ms. Leandra C. Ortiz, Attorney with WALSH GALLEGOS TREVINO KYLE, & ROBINSON, PC, 6770 W. Expressway 83, Suite 301 Harlingen, Texas 78552 and the Honorable Ms. Katie E. Payne, Attorney and D. Craig Wood, Attorney both also with WALSH GALLEGOS TREVINO KYLE, & ROBINSON, PC at 1020 N.E. Loop 410, Suite 450, San Antonio, Texas 78209.

10.     The Defendant City has been served and has answered by and through their attorneys of record, the Honorable Mr. R.D. Guerra, Attorney and the Honorable Mr. Ysmael D. Fonseca, Attorney both with the Law Firm Of Guerra & Sabo, P.L.L.C., 10213 N. 10th St., McAllen, Texas 78504.

11.     The Defendants Farley and Valley Forensics, P.L.L.C. have been served and have answered by and through their attorneys of record, the Honorable Mr. Edward John Castillo, Attorney with the Law Firm of Gonzalez Palacios L.L.P., 1317 E. Quebec Ave, McAllen, Texas 78503 and the Honorable Ms. Diana  L. Faust, Attorney with the Law Firm of COOPER & SCULLY, P.C., 900 Jackson Street, Suite 100, Dallas, Texas 75202.

## VI.  <u>FACTUAL RESUME</u>

A.      ABOUT THE SCHOOL DISTRICT BUS SYSTEM

12.     In the Fall of 2016 the Defendant School District had just recently received funding for new video cameras to be installed in all its school buses.  This included Bus #118 the bus driven by Ms. Laura Ruiz that Gabriel Miranda, Jr. was on, before he fell off.  That school bus was

equipped with four (4) video cameras and concurrent audio channels.  When interviewed after the incident Jose Davila, a School District employee stated that a week before the incident all the audio and video channels were functioning.  Also, that there is a light system, as well as a beeper, that should work to inform the driver when a door is opening or opened directing the driver to slow down and stop the bus to assure all the students were safe.

B.      ABOUT GABRIEL MIRANDA, JR. AND FAMILY

13.     Gabriel was born on December 28, 2002 to his mother Maria and father, Gabriel, Senior.  It was a large and loving family with numerous aunts, uncles, cousins, grandparents and his siblings, all steeped in a long and respectful Mexican-American and Hispanic Heritage. From early pre-kindergarten trough the 5th Grade he attended the Travis Elementary School, in the Harlingen Independent School District. He loved science and music and over the course of time music became a very important part of his life. Gabriel had big plans. He was going to be an engineer and wanted to travel the world. He had gotten his passport, and his father was saving up miles for a trip to Paris for his 15th birthday.

14.     In 2013 Gabriel entered the sixth grade with the Vernon Middle School.  He was a very good student and got top grades in many of his academic classes.  He also joined the Middle School Band and learned how to play both the regular and baritone saxophone.  He practiced a lot and by the Fall of 2016 was awarded first chair in the School Band for the baritone saxophone. He was so happy about being in the band that he designed a T-Shirt for all band members.

C       THE FIELD TRIP OF NOVEMBER 14, 2016

15.    November 14th was a Monday. The Band was scheduled to go on a field trip to the University

of Texas- Rio Grande Valley.  Even though Gabriel was still only in the 8th Grade  he had

already taken some early education engineering courses at the Texas State Technical College.

His goal was already clear, he wanted  to be further along in his college and career path after

graduation from high school by taking these advanced courses.  His mother has reported that

Gabriel awoke early that day and was very excited to visit the University.  He also reminded

her to place the order for the T-Shirt he had designed.  That previous weekend he had sent

and received text messages back and forth E.L.[2]  Later that morning Gabriel and about

41student band members boarded School Bus #118 for the trip from the school to the

university.  One of his instructors had just told him that he was chosen to play a "solo" for

an upcoming band performance.  He was naturally quite happy about the selection.

16.    In order to assure Laura Castro Ruiz, the School Bus Driver was not distracted with

supervisory duties the District appointed two teachers, A.J. Ayala and Michael J. Carlstead

to supervise the students while on the excursion.

17.    At about 8:27a.m.[3] Gabriel is the first student to enter the bus and the video evidences he is

happy and smiling. The audio reflects he continues to be happy and communicative with his

friends and staff.  He changes seats a few times and eventually ends up at the rear of the bus

---

[2].  The students involved in this case are all over the age of 18 and no longer have any reasonable right or
expectation of privacy, but nevertheless Plaintiffs will protect their anonymity at this time, with their real names
provided to the Defendant and this Court in an agreeable protective order.

[3].  As noted above, there were four cameras and four audio channels on the bus but later only one video
channel apparently functioned on the day of the incident, which only showed the front of the bus. The audio channels
were open.  In any case, the times and statements noted in the following sections are taken from the video and audio
portions of the tape that were noticeable and was painstakenly reduced to a transcript by a third party.

in a row and seat by himself.  Across the aisle sits his friends D.K. and J.O.  E.L. a recent
girlfriend, sits in the row up and across from Gabriel.  The audio tape reflects substantial
banter back and forth between all the children.

18.      At about 8:41am there is a comment from either J.O OR D.J. that he "can't shut it," but it
is unknown as to what the student is alluding to, maybe the window or the door.  About two
minutes later a female student again yells out "close it."  The rest of the audio reflects that
Gabriel and his fellow students are happy being on the bus and continue to communicate in
this manner.

19.      The video also shows that the teachers, Ayala and Carlsted enter the bus and sit near the
front.

20.      At about 8:55a.m. the bus starts moving and by 9:07 is on the highway.  At about 9:16am
there is beep.  The bus driver does not address the beeping and keeps driving.

21.      At about 9:11a.m. a girl says "Oh, like .. If right now ... if I were to fall out." Another says
".. I double dare you."  The first again says "if I were to fall off. ..." .  At this point and upon
reason belief the students are referring about falling out the back of the bus.

22.      At about 9:34a.m. there is another beep.  At this point the bus driver surely should have
stopped driving to check on the windows, the back door or both.  Instead the bus driver still
continues to drive now unsafely.  Shortly thereafter J.O. says "how am I going to close it."

23.      At about 9:35a.m. there is another beep.  The bus driver does not address it and again should
have stopped driving.

24.      At about 9:36a.m D.J says "if you move it, you are not going to die."  Again, and  upon

reason and belief Plaintiffs believe the students are now surely referring to the door at the back of the bus.

25.    At about 9:37a.m. there is another beep.  The bus driver again fails to respond to problems with the door opening and closing and continues to drive unsafely.

26.    At about 9:39a.m. a female student says ".... I might just jump right now than ..." obviously referring to the fact the door had been open at some point.

27.    At about 9:40a.m. a E.L. says "I said close it."  Upon reason and belief Plaintiffs again believe the students are referring to the door at the back of the bus and a door which had been opended.

28.    Shortly thereafter there is another beep.  The bus driver doesnt respond and continues driving dangerously.

29.    At about 9:41a.m. J.O or D.J. says "Do it right now" and Gabriel says "no" and then says "don't touch it."  A scuffle is heard.  Gabriel again says "don't touch it."  Upon reason and belief Plaintiffs again believes that Gabriel is referring to the handle on the exit door. Then he says "no." Then again "no, stop." Upon reason and belief Plaintiffs ascribe this statement to something J.O. or D.J. was doing with the door handle.

30.    A few seconds later the alarm goes off again.  There is big thump noise. The bus driver continues speedily on her way.

31.    Gabriel screams.  Finally, the teachers turn around.  About 30 seconds later the bus finally stops.

D      IMMEDIATELY AFTER THE INCIDENT

32.   Even after Gabriel had fallen out of the bus the Driver continued traveling for several miles before pulling over to the side of the road.

33.   At 9:42 a female voice, M.D., says "he was trying to close the door."

34.   A few minutes later E.L. also says "... he was trying to close the door."

35.   Shortly thereafter a third different female voice M.U. also says "... he was trying to close the door." J.O. says "we didn't bother him." A female student S.J. asks J.O. and D.J. "Were you messing with the door."

36.   At about 9:43 the Bus Driver tells the students to close the exit door. D.J. says he can't because of something sticking out. Finally, the door is closed but he comments and says that "it doesn't close fast."

37.   A female voice at 9:44am asks "did it open by itself."   Another female student, S.M. says "... I promise, how he was trying to close it, when it opened ..." E.L. is crying and asks "why would he jump out.  D.J. says "I don't know."  The video shows J.O texting.

38.   Another female student M.U. reports that everything was "caught on camera anyways." At about 9:54 J.O. states "he was talking to us, he wasn't even mad, he (Gabriel) was making jokes."

D.   THE COVER-UP BEGINS

39.   A number of students, including M.U., tell others to delete all videos and text messages.  At around 10:14 J.O tells D.K. to "delete your messages."

40.   911 was called.  Sheriff's Deputy James Prado of the Hidalgo County Sheriff' Department was one of the first law enforcement personnel to arrive on scene.  He later filled out an

incident report.  A group of local police with the City of Edinburgh begin to arrive.

41.     Sheriff's Deputy Jose Lopez of the Hidalgo County Sheriff's Department arrived at the scene
to assist Deputy Prado.  Deputy Lopez, in his report, written in close temporal proximity to
the actual utterance wrote "..... Dispatch advised that a child possibly fell off a school bus."
There is some chatter that Gabriel had broken up with a former girlfriend and became
suicidal.  Within moments across the radios for all the responders the narrative that Gabriel
had committed suicide gained momentum, credibility and took on a life of its own.

42.     Officer Armando Celedon, an Investigator with the City of Edinburgh supervised the
investigation.  He told the Miranda family it would take close to a month for it, and the
coroner's report to be completed.  At first he told the family that he had looked into Gabriel's
phone and found no evidence that Gabriel was depressed or wanted to hurt himself.

43.     Nevertheless and in and around the same time, Celedon was communicating with a School
District employee and Assistant Director of Transportation Hector Ramos.  While Ramos had
only been with the District about three years he had 35 years in law enforcement with the
Department of Public Safety and was thus trusted by Investigator Celedon.

44.     Ramos arrived on the scene.  Soon after the incident Celedon told Hector Ramos that he
believed that Gabriel's death was a suicide and was intentional.   Upon reason and belief
Plaintiffs posit that Celedon offered this alternative in order to protect the District what he
forsaw as a negligence claim.

45.     At and around the 10:30am Celedon, Ramos and members of the Edinburg Police
Department immediately began to interview and reduce into affidavit form statements from

many of the students.  The record reflects there 41 students on the bus.

46.   Only 29 affidavits have been produced by the City to the family upon a previous public
information request, but of those, almost all reinforce the fact that there had been numerous
beeping sounds and the bus driver kept driving.  Further, many confirmed that when the door
was open the driver still continued driving for a significant period of time.

47.   Almost all of the 29 affidavits produced by the City also reinforce the narrative that Gabriel
was depressed, suicidal and committed suicide except a few "that got though." In this group,
a male student J.T.R. reported that Gabriel "was attempting to close it but fell out of the bus"
as did a similar statement by N.R.

48.   Another male, J.L. wote that "I heard people saying that the door was opened by people
messing with it."

49.   A female student S.H. wrote that she heard that "some girl was saying he was trying to close
the back door as did C.M.  S.N.G said the same. M.D. made a similar comment.

50.   Another female student S.A.M. who was sitting right in front of E.L. summed it up best and
wrote:

"I heard the little siren (first) and looked back.  I saw the back bus door open
(second) and then I saw Gabriel  Miranda standing by the door (third).  I saw him
reaching for the door (fourth). I then saw him fall out of the bus on the roadway
(fifth)."

51.   On the day of Gabriel's Death, Superintendent Cavazos informed the public that the School
District had just recently received funding for new video cameras to be installed in all its
school buses.

52.   Cavazos alo announced that the video on Bus #118 Video would provide answers as to what

occurred.  Later it was announced that the video system had failed.  Specifically, there is

video, then it unexplicably shows a blank screen until after Gabriel's fall.  Then the video

picks up again.  As noted above, the audio of all four channels remained open.

53.    The Justice of the Peace, Judge Espinoza declared the time of death for Gabriel as 11:45am

well after the coverup began about an hour earlier

54.    A toxicology report was ordered and the Hidalgo County instructed its pathologist, Dr. Farley

to conduct an autopsy.  Amazingly, a process that takes a significant amount of time was

completed overnight.  But the decision was already made, Detective Celedon communicated

with ISD Employee Hector Ramos at about 5:00pm on the day of the incident and reported

it already had been determined to be suicide even though the audio-video tape had not even

yet been disgorged and produced to any of the investigative bodies, the school, the city or

county.

55.    Just a day after Gabriel's death, on the 15th Farley wrote that the cause was suicide.  She

wrote that she based her decision solely on "investigative information available including

affidavits from individuals on the bus."

56.    On November 16th, just the second full day after the Gabriel's death Lt. Oscar Trevino,

Assistant Police Chief, while standing in front of the family's house, with Gabriel's close and

extended family, ands numerous fiends announced that the death was ruled a suicide based

upon the then open investigation and the Coroner's Report.  He told the family the video

supported that result even though that was a fabrication.

57.    As noted above, later the entire file was requested by the family. In it was a significant

amount of information that did not support the suicide theory, all noted above.

58. Most importantly, and also in addition to the above, a adult witness named Earon Fox who was driving behind the school bus and not a School District employee or parent of a student was also interviewed by the police.  In his own handwriting he wrote that "... the back door was open wide. I saw him (Gabriel) attempting to close the door holding with his left arm & reaching reach with his right arm ..."  and "he landed on his feet ... " Fox commented that the bus was driving while the door was open.   The written affidavit that the police later asked him to sign to did not have all this information.

59. Josh Hernandez with EMS at the scene wrote he heard a student say that said "it didn't look like he intentionally jumped out, ... it looked like he was trying to close the door but had fell out. I also heard a student was sitting close to him on the bus and they were playing with the door and that he didn't intentionally jump out ...."

60. In one officer report, it was noted that some students  reported "he (Gabriel) was trying to close the door" and there was another statement that "other students were playing with the door."

61. Later there were text messages between various students including J.O. discussing the rumor there was a dare between students about playing with the door and/or door handle.

E.    THE FINAL REPORTS

62. When Coroner Farley issued her report she confirmed the suicide was solely based upon statements given to her that supported that theory; i.e., affidavits of students.  None of the information that supported a different narrative was apparently provided to her, the video

tape, the audio takes, other statements from students who stated Gabriel was trying to close the exit door nor the statement from neutral citizens like Fox and the EMS provider, or text messages.

63. Notwithstanding all the above-noted evidence otherwise, the final report provided by Investigator Celedon ruled the incident as suicide. Assistant Police Chief O. Trevino on behalf of the City ratified this conclusion even though the report does not include any of the time-designated facts from the previous section and available in the affidavits and audio evidence collected by the City.

64. If fact Trevino and others relied on only one video channel that shows nothing, even though he told the family that the video evidence supports a death by suicide theory.

65. The report mischaracterizes all the evidence and steers the reader into the belief that Gabriel was depressed and committed suicide. There is no mention of any investigation into the story there was a dare between the boys, including his nephew J.O., about opening the door

66. There is no recognition of the first hand neutral observation by Earon Fox.

67. Of course by all had the Coroner's Report by Farley which ratified this conclusion. In fact, she went further and stated it was common for young men of Hispanic heritage from the Valley to commit suicide, even without ever showing prior signs of depression.

68. The School District Superintendent Cavazos joined in the coverup at the at time as did City Staff

69. Jose Davila, a School District employee had been asked to provide the audio and video computer generated information to the City of Edinburgh Police for the investigation. In one

report he admitted and wrote that "all data deleted from both transportation pc's."

E.    THE SCHOOL DISTRICT'S INVESTIGATION

70.    In early interviews with the Investigators with the City and later the School District, Bus Driver Laura Castro Ruiz, stated that she heard the beeping often.  But rather than stop as required, she did not because she thought the sounds were caused by windows opening and not the exit.  Thinking there was no danger, she kept driving. In fact, she admits a number of times in interviews and depositions that she has heard a buzzer go off several times previous to that day, and that day as well, but as she had previously kept driving anyway. The opening of the window and exit door apparently make almost the same or similar sounds. Also, she has testified that students in the past had  messed around with the back door exit and handle, so she thought nothing of it when she heard it again that day.

71.    A number student affidavits taken on the day of the incident and again during the District Investigation state the same, that the back door had beeped a number of times and the bus driver did not stop driving.

72.    The School District Superintendent Cavazos of the Defendant School District ratified and adopted a self-serving finding that Gabriel died at his own hand, even though there was objectively verifiable evidence in support of a different conclusion by their own inquiry afterward.  Apparently some of that evidence was destroyed.

73.    Rather the of the Defendant School District relied upon a false narrative and raced-based stereotype fostered by the Coroner, in an effort to deflect criticism and responsibility from itself and destroyed evidence in support of this self-serving theory.

74.     While still yet alive and prior to the time the J.P. announced the time of death, Gabriel's good name was defamed.

75.     After the "death by suicide" narrative became public his family became objects of derision, experienced embarrassment, significant emotional anguish and legal expenses in defending "their good name."  Their shame and heartache is ongoing.

76.     Of course, even if by some stretch Gabriel did die by his own hand, if the School Bus Driver had followed necessary standards of care, he would be alive today.

77.     They were so intent is obviating the blame for Gabriel's death that the evidence gathered in their own investigation clearly supports the theory the driver was negligent.

## VII.  STATE ACTION

78.     Plaintiffs incorporate by reference as if fully set forth herein all the above-noted paragraphs in this section dealing with causes of action.  Equally each section and paragraph below incorporates by reference as if fully set forth herein the one above it.

79.     At all relevant and material times the Defendants were in their stated capacities acting within their duties pursuant to the statutes and regulations promulgated by the State of Texas and the United States of America.

## VIII.  CAUSE OF ACTION- TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964

80.     Title VI of the Civil Rights Act of 1964 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions, not permit the student to be a victim of discrimination based upon race, nationality or country of origin, or stereotypes based on race, nationality or country of origin.

81.    The fact as noted above, evidence the School District and City Defendants adopted and ratified a stereotypical premise that ostensibly that because some young men of Hispanic heritage died of unknown causes, it was presumed the deaths were acts of self-harm suicide, and that Gabriel Miranda fit this stereotype.  Such stereotypical thinking, and related verbalization and acts related to such stereotypical thinking, is a violation of Gabriel's good name, and violates his civil rights pursuant to Title VI.

### IX.  CAUSE OF ACTION- UNITED STATES CONSTITUTION

82.    Section 1983 of Title 42 of the United States Code provides, in part:

"Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, and citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the part injured in an action at law, suit in equity, or other proper proceeding for redress…"

83.

84.    .

### X.  CAUSE OF ACTION- CIVIL CONSPIRACY

85.    The acts and omissions of each Defendant in alleging that Gabriel committed suicide when there existed at that time that he did not, rises a very, very strong inference that such acts and omissions were pre-determined to steer liability ability away from the School Distict Defendant.  Such a meeting of the minds, was for an unlawful purpose or in addition and in the alternative, a lawful purpose but used unlawful means.  Further each Defendant

committed an overt act in furtherance of such objectives and Gabriel before he was decalred

dead by the Justice of the Peace and his family thereafter suffered an injury as a proximate

result of such wrongful acts. Accordingly please have a plausible cause of action pursuant

to 42 U.S.C. 1985 [Conspiracy To Interfere With Civil Rights].

## XI.  CAUSE OF ACTION- SURVIVORSHIP CLAIMS

86.    This claim for damages occurring after the death of Gabriel alleging he died at his own hand

is brought by the surviving family members in the name of the estate against all Defendants.

Any person or entity required to be a named Plaintiff in this lawsuit to collect damages under

Section 71.021., Tex. Civ. Prac. & Rem. Code, is a already named.  Plaintiffs bring this

survival action pursuant to Tex Civ. Prac. & Rem. Code, Section 71.021, because of the

personal injuries suffered by each of the decedents, their own pain and suffering, based upon

the facts and legal theories more fully set out above.

## XII.  CAUSE OF ACTION- LIBEL AND SLANDER PER SE

87.    Gabriel has a plausible claim he was a victim of libel and/or slander *per se* before the time

he was declared dead by the Justice of the Peace, pursuant to Texas Civil Practices &

Remedies Code, Chapter 73.

88.    The Estate of Gabriel Miranda Jr., also has a plausible claim they were a victim of libel

and/or slander *per se* after the time he was declared dead by the Justice of the Peace, also

pursuant to Texas Civil Practices & Remedies Code, Chapter 73.

89.    Both experienced injuries and damages thereby.

## XIII.  CAUSE OF ACTION- FRAUD

90.  The Estate of Gabriel Miranda, Jr. has a plausible claim the Estate was a victim of *Fraud* because all the Defendants made a false representation that Gabriel committed suicide when they knew or should have known he did not. The Estate experienced injuries and damages thereby.

### XIV-  CAUSE OF ACTION- NEGLIGENT MISREPRESENTATION

91.  The Estate of Gabriel Miranda, Jr. has a plausible claim the Estate was a victim of a *Negligent Misrepresentation* by all the Defendants as they all made the false representation that Gabriel committed suicide when they knew or should have known he did not. The Estate experienced injuries and damages thereby.

### XV.  PROXIMATE CAUSE

92.  Each and every, all and singular of the foregoing acts and omissions, on the part of the Defendants, jointly and severally, taken separately and/or collectively constitute a direct and proximate cause of the injuries and damages Gabriel experienced before declared dead and by his Estate, thereafter.

### XVI.  DAMAGES

93.  On account of the acts and omissions of the Defendants, jointly and severally, Plaintiffs on behalf of Gabriel and for themselves have experienced significant injuries and damages, for which they are entitled to recover within the jurisdictional limits of this court, including but not limited to:

a.   Stigma;

b.   Mental anguish in the past;

c.      Various out-of-pocket expenses incurred by Plaintiffs;

d.      Punitive damages; and

e.      Attorneys fees and costs.

## XVII.  RATIFICATION AND RESPONDEAT SUPERIOR

94.     The Defendants ratified the acts, omissions and customs of personnel and staff that have given rise to this cause of action.

95.     As a result, the Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for the injuries to Plaintiffs based upon the theory of *Respondeat Superior*.

## XV.  SPOILATION

96.     The Defendant School District has failed to maintain, or in the alternative purposefully withheld or destroyed certain evidence integral to the fair adjudication of this cause.  As such items constitute "spoliation" of evidence, Plaintiffs believe it reasonably necessary to invoke use of the *spoliation interference rule*—an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XVI. EQUITABLE RELIEF

97.     In addition to the above, Plaintiffs seek *Declaratory Relief* pursuant to Fed. R. Civ. P. 57; 28 U.S.C. §2201, a *Temporary Restraining Order* and later a *Permanent Injunction*, pursuant to Fed. R. Civ. P. 65 asking the Court to compel Farley to reform her *Coroner's Report* to reflect that Gabriel died from trauma to his head (or some other reasonably related

alternative) and not suicide.

## XVII.  REQUEST FOR JURY TRIAL

98.     Pursuant to Federal Rule of Civil Procedure , Plaintiffs demand a jury trial for all issues in

this matter.

## XVIII. ATTORNEY FEES

99.     It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon

judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 42 U.S.C.

§2000d et seq. and 42 U.S.C. §1988.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs first fro the equitable relief requested

above in that Defendant Farley change her previous coroner's report stating Gabriel had died because

of his own suicide to rather he died because of trauma to the brain, and also they pray for judgment

against the  Defendants for civil damages, jointly and severally, in an amount sufficient to fully

compensate them for the elements of damages enumerated above, damages, recovery of attorneys

fees and costs together with pre- and post-judgment interest, and for such other relief as this Court

deems just and proper in law or in equity or both.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq
marty@cirkielaw.com [Email].
State Bar No.: 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]

(512) 244-6014 [Facsimile]

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 23, 2021, a true and correct copy of the above and foregoing document was served electronically upon the below-referenced counsel of record or party in accordance with the Federal Rules of Civil Procedure and the Court electronic filing system.

Ms. Leandra C. Ortiz, Attorney
State Bar. No. 24043854
Fed. ID. No. 574013
lortiz@wabsa.com [Email]
WALSH GALLEGOS TREVINO
KYLE, & ROBINSON, P.C.
105 East 3rd Street
Weslaco, Texas 78596; and
(956) 647-5122 [Telephone]
(956) 647-5421 [Facsimile];

Ms. Katie E. Payne, Attorney
State Bar. No. 24071347
Fed. ID. No. 1786856
kpayne@wabsa.com [Email];

Mr. D. Craig Wood, Attorney
State Bar. No. 21888700
Fed. ID. No. _____
cwood@wabsa.com [Email]
WALSH GALLEGOS TREVINO
KYLE, & ROBINSON, PC
1020 N.E. Loop 410, Suite 450
San Antonio, Texas 78209
(210) 979-6633 [Telephone]
(210) 979-7024 [Facsimile]
COUNSEL FOR HARLINGEN CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

Mr. R.D. Guerra, Attorney
State Bar. No. 08578640
Fed. ID. No. 5949
rdguerra@guerraleeds.com[Email]
Mr. Ysmael D. Fonseca, Attorney
State Bar. No. 240699726
Fed. ID. No. 1139283
Guerra & Sabo, P.L.L.C.

*Notice of Appearance*                                                                 23

10213 N. 10th St.
McAllen, Texas 78504
(956) 383-4300 [Telephone]
(956) 383-4304 [Facsimile]
COUNSEL FOR EDINBURG POLICE DEPARTMENT, DAVID EDWARD WHITE, CITY OF
EDINBURG, RICHARD H. GARCIA, RICHARD M. HINOJOSA


Mr. Preston Henrichson, Attorney
preston@henrichsonlaw.com [Email]
Texas Bar No. 09477000
Federal I.D. 19# 22
Law Offices of Preston Henrichson, P.C.
222 W. Cano St.
Edinburg, Texas 78539
(956) 383-3535 [Telephone]
(956) 383-3585 [Facsimile]
COUNSEL FOR COUNTY OF HIDALGO AND RAMON GARCIA


Mr. Edward John Castillo
State Bar. No. 08131900
ecastillo@valleyfirm.com [Email]
Gonzalez Palacios L.L.P.
1317 E. Quebec Ave
McAllen, Texas 78503
(956) 618-78503[Telephone]
(956) 383-0445 [Facsimile]; and

Ms. Diana  L. Faust, Attorney
State Bar. No. 00793717
dianna.faust@coopescully.com [Email]
COOPER & SCULLY, P.C.
900 Jackson Street
Suite 100
Dallas, Texas 75202
(214) 712-9500 [Telephone]
(214) 712- 9540 [Facsimile]
COUNSEL FOR NORMA JEAN FARLEY AND VALLEY FORENSICS, PLLC


/s/ Martin J. Cirkiel
Martin J. Cirkiel

*Notice of Appearance*                                                                                       25